Start getting ready for 23-4122 Stella v. Davis County. It seems like a hybrid here. Mr. Trent, too? Yes, sir. May it please the court, Trustee Kennedy and Michael Homer on behalf of the defendants' appellants. This case arises out of the death of Hilda Miller. She died on December 21st, 2016, about 10 p.m. in KD Hospital with a ruptured spleen. She suffered that ruptured spleen in the fall at the Davis County Jail. It was never detected until her autopsy. She sued her estate, and her mother sued the nurse who attended her, Marvin Anderson. Anderson's nursing supervisor, James Ondercheck, the sheriff, Todd Richardson in Davis County for state and federal civil rights violations. Ondercheck and Richardson prevail on both the state and federal claims. The jury finds against Anderson on the federal claim awards $300,000. They find against the county on the federal claim awards, award $3,850,000. They award the same amount on the state claim for the same injury against the county, $3,850,000. Why would the amount against the county be more than the amount against Anderson? I don't understand how that could happen. There's no, it's not, well, it's certainly not any kind of damage. I mean, there's so much about this case that is unusual. We raised a lot of issues on the field. I think a fair statement can be that when the court looks at those issues, it will definitely come to the conclusion that the county and Anderson did not receive a fair trial. Now, I cannot address all the five of all those issues on my time. I'm going to reserve five minutes. But I want to talk about five of them. And I want to talk about them because of the standard of review. The first four will deal with, we believe this case should be, the verdict and the judgment set aside, remanded for an infinite judgment in favor of Anderson and the county. The fifth one deals with an evidentiary issue. And that is the district court prohibited us from using impeachment and proven evidence related to the quality of Miller's life and her relationship with her mother and sole heir and only witness. The first issue, and again, it's a de novo review, and that's why we chose it, the state claim. They awarded $3,850,000 against the county on the violation of the state civil rights claim. But they found, the jury did, that Anderson didn't violate her rights, Andertag didn't violate her rights, and neither did Todd Richardson. In other words, there was no violation of her rights, Miller's rights, by his county employee. Does the jury have to find that? How about Nurse Layton? Could they rely on Nurse Layton? No, they can't. Why? Well, for a couple reasons. They never, the Utah court says, Utah law is, you don't have to name a defendant, but you have to identify, and the jury has to find that they did in fact violate the plaintiff's rights. Layton was never accused. There was no John Doe defendants in the complaint. The court was, the jury was instructed that the people to look at for a violation of state rights were Anderson, Andertag, and Richardson. And quite honestly, Layton didn't do anything. Well, that's part of the problem. The phone call comes in. He says, don't worry yourself. No, he didn't say that. That was what somebody else said. The call went in from Deputy Lloyd. Lloyd and Layton both said, when he described Miller's condition, Layton says, keep an eye on her. If it changes, get a hold of me. And it was a clerk who said, I think he said, don't worry about it. But still, that wouldn't meet the testimony of Utah law since they never identified him. He was not in an argument. Why wouldn't the county be liable if you had a sheriff who said, I'm not going to train any of these medical people. And it was clear that if you don't train the medical people, inmates are going to die for improper care. And then you sue the county when that actually happens. And you don't blame the individual employees at the jail because they didn't know any better, so they didn't have the requisite subjective intent to establish cruel and unusual punishment. But the county does. They sued the sheriff and the honor check for failure to train and have policies under the state law. And the jury found in favor of them. And there was training. They sued the sheriff for that? Yes, they sued the sheriff. They sued the honor check and the sheriff for training and medical policies. And the jury returned a verdict in favor of them. And the court's rationale when I pointed this out in post-trial trial motions was, well, they must have found somebody violating the rights. That doesn't mean that doesn't accord with due process. The Utah Supreme Court has said you've got to identify who violated the rights. And the jury has to find that violation occurred. You don't have to name them. Maybe they thought all three did collectively. Well, I would say the record that all I can go on is what the verdict says. And it's your verdict form. You approved it. But what I'm saying is— But what I'm saying is it's your verdict form and you approved it. If you wanted a line on there that said, or any collection of employees violated the rights, you could have asked— That's—the plaintiff should have asked for that. So that's not my part of the task force. You're the one making the argument today. Well, what I'm saying is they never identified anybody. The court never identified anybody. The court instructed, look at Layton—I mean, excuse me. Look at Ottertack, Richardson, and Anderson. Well, you need the employee for 1983 unquestionably. But you don't under state law, do you? Yes. You don't need to name them. But they have to be identified under Utah law. On a verdict form? They have to be identified in the pleadings. Okay. Identified in the trial. And then on the verdict form, I think they'd have to— Well, yes, they'd have to find that this person violated the rights, even though they're not named as a party. You don't have to be named as a party. You've got to be identified and found to violate it. Which brings me up to the second issue of Anderson's qualified immunity. The court said, standing along the fact that Anderson had a reasonable belief that Ms. Miller was going through withdrawal from methamphetamine, based upon what she told him, based upon years of experience dealing with inmates going through meth, wasn't enough for qualified immunity. But that's the ultimate test for qualified immunity, is was there a reasonable good faith belief on the part of the government official that what he was doing was right? Correct. You could have a reasonable belief that she was going through withdrawal and still be deliberately indifferent to looking at other possibilities when somebody is very seriously ill and is acting—is so weak that, okay, I still think she's going through withdrawal, but I better take some vitals because this woman looks bad. Maybe I better call a doctor. I think it's withdrawal, but I better call someone. That's not inconsistent to have a reasonable belief about withdrawal and still being deliberately indifferent to her welfare, is it? It would not be inconsistent, but it would be inconsistent with the facts. Admittedly, he did not take her vitals. All the experts agreed that if he had taken her vitals and it was required by jail policy, it would have been normal. And monitored. And monitored. That wouldn't have been normal. But they said within an hour it would have been abnormal. And they gave these readings of what it would have been within an hour. Well, when she finally was transferred to the hospital three hours later, they had not reached that level of alarm that plaintiff's experts said would have been there. Well, you've seen the video of her coming down the stairs and the dizziness and the nausea, which are not coming off of methamphetamine symptoms. Can't hold her head up. And, of course, we're not the jury. We're just evaluating what happened and applying a standard of review to it. But Anderson testified that they are. He gave the symptoms of nausea, dizziness, weakness. He testified that he had helped hundreds of inmates on a coming-off-meth walk in that manner. That that is not unusual for him. It is what is in his mind. It has to be judged. That 20-minute window he was with her and what he believed and what he truly believed. And the judge said, yeah, he believed that, but that won't give him qualified immunity. Remember, qualified immunity is different to deliberate indifference. We judge it on the reasonable belief the officer had. And he had it. And it was for the court to decide. I want to check one fact you said. Did you say that when her vitals were checked about three hours after she fell, they were okay? No, they were elevated. But that's what Anderson said you would expect from someone coming off meth. Plaintiff's experts said her vitals were falling from the floor. And they weren't. They were elevated. And Anderson said, if you're going on meth, coming off meth, your pulse is elevated, everything is elevated. Those were vitals taken at the jail? It was taken at the jail by the paramedics. Three hours after the fall? Yes. And how about the next measurement of the vitals? What happens with a ruptured spleen, once you plummet, you plummet quickly. And how much after the time, after the elevated? I think it was five or ten minutes after she left the jail. So it raised the question about the validity of the first vitals. Well, not really. The testimony was that your body maintains until it can't move on or maintain. Anderson, the federal claims against Anderson, I submit that this is controlled by the Maddox case. This is right on point with Maddox, where the nurse does the evaluation, writes a chart note, and they say, this court said, you look at their state of mind when that happened. And that that state of mind was no heart attack. Anderson's state of mind was meth, and it's in his chart note, which is in the record. The quality of the life and impeachment evidence, I think we briefed that fairly clearly. We were not allowed to put on any evidence as to the quality of Miller's life or the lack of credibility by her heir, and only damage was settled with that. I'll reserve the rest of my time. May it please the court, Michael Lutz for the Spence Law Firm, and I'd just like to introduce you all to trial counsel, Tad Draper and Dan Vizinski. And also with us today is Cindy Stella, mother of Heather Miller, the young woman who died in this case. Your honors, I'd just like to sort of follow along with what opposing counsel did and address those points. The first issue as far as whether there's some sort of incompatibility between the finding with respect to the individual actors and then the county itself on the state law claim, I did want to set one matter straight. So in their brief, the appellants cite two different Utah cases that relate to this issue. The case they rely on is Cheek v. Iron County. That's a 2018 Utah Court of Appeals case. But I'd like to quote from another case they cite at page 22 of their reply brief, which is Kaczynski v. Fox-Elder County, a 2019 Utah Supreme Court case. And at paragraph 14, the court said, a plaintiff need not identify a specific governmental employee in order to hold a municipality liable under the Utah Constitution. So that was the case involving a truck driver who had some kind of inner ear problem. The cops pulled him over thinking that he was a drunk, and they left him in jail longer than he should have been left there. And he had no idea what particular governmental employee or actor was responsible for that decision. But the Utah Supreme Court said, it doesn't matter. You know it was somebody from this governmental entity that can go forward. So here, we're substantially better than that. Sure, Nurse Layton isn't named in the complaint. But he testifies at trial. And we know exactly what he did. As far as his statement, don't think too much or don't worry too much about it. That is a statement that somebody who is also a party opponent, an agent of the defendant, is repeating while speaking to him on the telephone. So a jury could reasonably believe that Nurse Layton, in fact, made that statement. Do we know that just by testimony about what this person was repeating, or is there a recording? There is no recording, but there is actually a log that the clerk kept, and it's noted in the log and in his trial testimony. I'd also like to briefly address, as far as the issue of Nurse Anderson's qualified immunity, I don't think it ultimately matters whether or not the district court made some sort of finding that Nurse Anderson had a reasonable belief. But that's also simply not true. So I'd like to direct the court's attention. It was Exhibit F to the appellant's opening brief. That's the decision on Anderson's motion for judgment as a matter of law in a new trial. And on page 15 of the court's decision, the judge stated, additionally, the court rejects Anderson's strange assertion that it was, quote, uncontested at trial, that he reasonably assumed that Miller was withdrawing from methamphetamine. And it cites the testimony from Nurse McQuillan, the plaintiff's expert, that dizziness is not a symptom of methamphetamine withdrawal. You know, there's still the more fundamental point that it's not like being in methamphetamine withdrawal immunizes you and makes you invincible against internal injuries. We have a lady who's just taken a fall from a height, landed splat on the floor, seems initially to be doing pretty well, you know, fixes her hair, gets dressed, and then suddenly is experiencing nausea and dizziness that are not symptoms of methamphetamine withdrawal, per the expert testimony. In the appellant's brief, they're relying on the testimony of Lawrence Lucius, a guard with CPR training, to say that those are symptoms. And she rapidly progresses to the point by the time she's at the bottom of the stairs, she can't even hold her head up, a classic symptom that she's losing blood. On those facts, Nurse Anderson can and was held liable by a reasonable jury, and he's certainly not entitled to qualified immunity, which at this stage, that ship has sailed. For the 1983, essentially, Amendment 8, quote, unusual punishment claim, Anderson had to have the requisite state of mind. He had to essentially know that he was risking her life by not taking her vitals. Do you agree on that? I would agree that subjectively he does have to know or fail to confirm a strongly suspected risk. Not necessarily just about failing to take her vitals. As someone who is evidencing gross signs of an internal injury and blood loss, not that he needs to take her vital signs, but that he needs to get her to a higher level of medical care. But otherwise, I generally do agree, yes, there is a subjective component to that analysis. And you think there was sufficient evidence of that? Absolutely. I mean, Nurse Anderson says that witnessing her coming down the stairs scares him. He says that he realized she was, quote, really sick. And on top of that, the Supreme Court has said that this subjective mental state can be proved by all the usual methods of proof. And Tenth Circuit case law is quite strong, for instance, in the Lucas versus Chernky case. And indeed, in the Mata case that the appellants are relying on, that you can also infer knowledge particularly about internal injuries. That's what the Lucas case says, from the heightened knowledge of a medical professional. The jury was instructed on that subjective component of the claim, right? Yes. Was there any objection to those instructions? You know... Insofar as they stated the objective, the subjective component. I do not believe so. I couldn't promise you that there isn't, but I think there were barely any objections in the jury instruction conference. Were the interrogatory, the special interrogatories, was their purpose to find out what fact-finding the jury made about state of mind, and then those could be used to determine whether a subjective component was satisfied? Absolutely. So there were... And that was everybody's understanding? Right, that those two factual findings would resolve the qualified immunity issue. Was it either needed to be satisfied, or both needed to be satisfied? I believe either is the way the test is articulated. Now, in the court, for those two findings on qualified immunity, the jury wasn't instructed to find the ultimate legal outcome. There was no objection either to the statement of those two interrogatories, special interrogatories, or to the proposition that if either is satisfied, then the subjective component is satisfied. Is that correct? Well, out of respect to the appellant's argument, I do think they're saying that there should have been a third instruction about a reasonable belief about methamphetamine withdrawal, and they believed that was also a necessary component. So I think that's their argument, and therefore I don't think that's actually true. But I also think that argument is wrong, again, because whether or not Nurse Anderson believed Heather Miller was a methamphetamine withdrawal does not in any way disprove that he also believes she had severe internal injury. I think that reasonable belief goes to the second component of qualified immunity. If there's no clearly established law that would tell a reasonable person you have to act such and such a way, then you're entitled to qualified immunity. But that argument wasn't made in those terms, was it? No. The idea that an inmate's right to adequate medical care is clearly established has never been disputed. The district court noted that it's never been disputed. It doesn't come up in the briefs at all. How about the second prong, the clearly established law prong? Was that ever opposed? No. I don't believe that there was ever any dispute that an inmate's entitlement to appropriate medical care is clearly established. Well, did the defendants make any argument that the law was not clearly established? No. And I want to briefly address, too, this idea about the one outlier reading. So when Heather Miller is first put into the ambulance and they get a blood pressure cuff on her, the very first reading off the cuff is elevated. And it was up to the jury to decide, hey, is this an outlier? Is this a bad reading? And there was testimony that, yes, sometimes those automatic cuffs give a bad reading. Or does it show that she was actually just doing dandy at the time she's being loaded onto the ambulance? Now, I mean, Nurse Anderson said to himself, they bought her to me dead. She's already, according to the testimony of Ken Starr, in late-stage hemorrhagic shock, where she's barely conscious. She's drenched in sweat to the point her hair is drenched. And one minute later, in those same ambulance notes, they note her as being cyanotic, which means her patient is blue. They're not perfusing. And very soon, the blood pressure cuff is reading zero for zero. She has no blood pressure at all. Is that the next reading of the vitals? It goes from elevated to zero? It wasn't. It was not the very next reading. I know it was within the ambulance ride that she had already coded. So she is, medically speaking, dead in the ambulance. And obviously, they keep working on her. They declare her dead once they realize she'd been down for too long to resuscitate. But I just would urge the court to leave it to the jury to decide what to make of the blood pressure cuff readings. Now, let me ask you about the amount of damages awarded against the county under the two claims. I don't understand that. That looks like a duplication. Explain how that's possible. Absolutely. And first of all, I'd like to remind the court of the standard of review. And the standard of review when trying to determine if there's some sort of inconsistency in these outcomes is that it has to be metaphysically impossible to resolve them. That's the Johnson v. AGLT trucking case. And so, the argument that we make in our brief— we're trying to peer into the mind of the jury who's already been dismissed. That gets into our waiver argument, but I'll put that on hold for a second. You know— Go to that first. The argument about inconsistent verdicts or excessive verdicts wasn't made until the jury had been dismissed. And those are—I do think those are two separate issues and do have a separate legal analysis. So, just excessiveness—shall I address inconsistency first? Yes. Just address inconsistency. Okay. So, yes. Inconsistency between two general verdicts has to be addressed when the jury is still there because you can pull them. You can re-instruct them. You can fix whatever problem and not have to have an entire new trial. And that's why it's important to do that. And there was no objection made. There was no objection made until the post-trial motions long after the jury is gone and that bill cannot be unwrung. What about the excessiveness thing? Was that argument made? You know, in fairness, I don't think the excessiveness argument does have to be made. It's still an extremely deferential standard of review where—as far as deciding whether this verdict is excessive. And keep in mind, we're in 1983 land. That means we're evaluating Heather Miller's own loss of her life. How much would she value her own life? And, first of all, we defer to the jury. Their verdict is inviolate unless the defense can establish that passion, prejudice, corruption, or other improper motive led them to come up with those numbers. And then, second of all, we defer to the district court judge for abuse of discretion. So, not only do we have this tremendous deference to the jury that heard and decided the issue of damages, then we defer to the district court judge and only overturn her decision upholding the jury verdict if it was arbitrary, capricious, or manifestly unreasonable. Did the district judge rely on the untimeliness of this argument about the verdict? The district court, in a footnote, said it wasn't going to decide general versus special because it still found for the plaintiff on the merits, but it did not ever say, yes, I'm finding that this was a special verdict and you didn't have to preserve it. So, it just hunted on that question, but that's still— The way I read the district court's analysis of these two verdicts was that they were different causes of action, which is irrelevant. You get damages for the injury, not for the cause of action. So, the analysis of the district court did not make sense to me, and I wanted to ask you about that. What you're arguing here, which I hadn't noticed before, maybe you raised it in your briefing here or below or both, but your argument here is much more persuasive that if there was a problem, you needed to bring it up while the jury was still there. But I don't see where that argument was made or accepted by the district court at any time. So, it was made that these were general verdicts and the jury— they had to be raised before the jury was discharged. In the footnote, though, the district court says, I don't even need to address the waiver question because I'm finding for you on the merits. And, you know, I do think that the merits— Did you mention that in your brief on appeal? Did you raise the timeliness issue on the brief on appeal? Absolutely, yeah. We went into quite a bit of detail, you know, with the Zane case out of the Ninth Circuit. And I do, you know, as far as the district court's reasoning, too, if they get past the waiver issue, I think there's, you know, a couple problems with the inconsistency argument. You're over by two minutes. Oh, gosh. Okay. So, I'd like to direct the court's attention to question 12 on the verdict form itself about duplicative damages, where it goes into detail saying, don't reward the same damages twice. So, what the jury could have done, it could have put 3.85, 3.85, and on this third question, question 12, it could have said, ah, there's some overlap. So, it's only five total, or it's only if the overlap is complete. It's only 3.85. They said there's no overlap. It's 7.7. Okay. And seeing that my time has expired, I thank the court and have nothing further. Thank you. Mr. Trenton? I'll give you five minutes since we went over. Thank you, sir. So, right to the nub of the question waiver, they raised all of these arguments in front of the district court. The district court rejected them all except one. They said we waived an instruction on advocacy of remedies in the state law. Well, we didn't believe it was our obligation to ask for that instruction, but we didn't appeal that. The court, they raised a special verdict, general verdict. Well, just from an overall viewpoint, the verdict looks strange to me, that it be identical under the two claims against the county. The amounts. The amounts. Yes, sir. That looks strange to me. But the time to worry about that is while the jury is still there, so you can ask them. No, this was a special verdict. And the judge addresses that in footnote one of her decision against the county. What difference does it make whether it's a special verdict or a general verdict? You don't have to raise it on a special verdict. A general verdict can do with a special verdict. You don't. You're not locked into that. And the judge says, rather than take up the contested issue of whether the jury verdict form was special or general in order to decide whether the defendant waived his rights to dispute the verdict, the court assumes that the verdict was a special verdict. Why is an instant question about how much damage is to a ward against a party, why would that be considered a special verdict? The form was a special verdict. On a special verdict, you don't have to object. Well, you mean whether it's the form it's on makes all the difference? No, sir. I'm talking about the substance. You have the jury saying the county owes this much on this claim and this much on this other claim. That sounds to me like a general verdict. No, sir. We went into a big fight with this before the trial. And they came out with that verdict, and I said, that's a general verdict. And the judge and claimant said, no, it's a special verdict. And I said, okay. And so I proceeded as though it was a special verdict. And she agrees with me. And that was at what stage? Was that after the jury had been excused? No, sir. That was before the trial. Before the trial? Yes, sir. And the point is, everything they claimed was waived, the judge considered, weighed the evidence, issued a ruling on the merits. And the law is very clear that you have full appellate review once the court does that. I don't think there's any doubt about that. A couple of other things I think is important. First of all, the – she was not declared dead until after 40 minutes at the KD hospital working on her. And they did an ultrasound, but they didn't go two inches far enough. They went across the chest to here. If they'd gone another two inches, they would have picked up the bleed, gave her a couple units of blood, and she would have survived. She was not dead. Yes, she had a low pulse, no pulse because of the loss of blood. And no blood pressure. No blood pressure, but alive. And they couldn't find it. Isn't the question of oxygen to the brain? Is that why they gave up? Is that there was just going to be too much damage? No, sir. They considered she was dying of an overdose. That was what they put down as a possible cause of death, was overdose. That was before the autopsy. That was what they said as a possible cause of death before they conducted the autopsy. Yes, sir. They said – No one had diagnosed a ruptured spleen until the autopsy, is that right? Yes, sir. Okay. And so they said Anderson was scared when he saw her slide down the stairs. He said, no, he was scared. It was a spray she'd been trying to walk down the stairs since she's dizzy. He had run to get a wheelchair for her. They said, Anderson said she was really sick. Well, she was sick from what he thought was meth withdrawal, and that's why he scheduled her to see the doctor. Meth withdrawal is not life-threatening. You don't die from withdrawing from meth. You throw up. You're sick. You're miserable. But aren't you raising issues that are for the jury to decide? No, this goes to his state of mind. Doesn't the jury have to decide his state of mind? No, on a qualified immunity. Not on qualified immunity. It's his subjective state of mind that you focused on. And that's why that chart note is so important. Same note that this court said showed the state of mind of Nurse Quintana and Matt. Quintana says she's not suffering from a heart attack. I told her, I examined her, and I told her to call if there's a problem. And she wrote that note as she examined Matt. Anderson writes the note as he examines Miller. You know, says he's coming off meth. A roommate says she's been lying down for a day, a day and a half. I told her to, there's an intercom in the cell, please call me if you have any change in your condition. And that's his state of mind. That's what this court said in the matter. You can't look at what happened before Anderson got involved with her, what happened after he was involved with her. You have to focus on that 20-minute window when he was dealing with her. And this court said that's the best evidence. What about the finding of fact? That's pretty solid, the jury verdict form. Defined by preponderance of evidence that Anderson was aware that Miller faced substantial risk of serious harm, or is there enough circumstantial evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk? Miller, answer, yes. Well, I'm going to take two days for that. That's cement. No, sir. Okay. Tell me why it's oatmeal then. You've got to divide them up between qualified immunity and deliberate indifference. Qualified immunity, and the court refused to instruct on it, refused to submit the jury verdict on it, did he have a reasonable belief that she was going to go through meth withdrawal? And, in fact, when cautioned and challenged on that, the court said, I can't believe you. Something about it wouldn't enough. Well, for qualified immunity, it is enough. And as for in cement, as we pointed out in the brief, the evidence we objected to, they introduced malpractice evidence. They introduced evidence of what happened to Miller when she was in the Lima unit where Anderson knew nothing about it. No one focused on it. The court did not restrict it just to that 20-minute window when Anderson was involved with her. That's part of the point, though, is that he didn't know what was going on in Lima. He didn't? Yeah. That's part of the point. She was put in the back room there and we'll get you a doctor tomorrow. No, sir. The evidence doesn't show that. The evidence was she had no place to put her in the medical unit. He put her in there where she can be watched. He wanted a 30-minute watch on her. Disputed. Thank you, Mr. No, that's not disputed, sir. That he ordered that is not disputed. Whether or not it was conducted, that may be disputed, but that's not Anderson. Okay, thank you. And that's the key, Anderson, what he did. And he followed the jail's policies were violence, assess. We had a policy against falls. If you have doubt, call the doctor. I'll call 24-7. And in any kind of injury, eventually have the inmate cleared by a physician. They were all in place. Thank you, Mr. Thank you, counsel. Case is submitted. Counsel excused.